## JAMISON v. NEW YORK & P. R. S. S. CO.
## NEW YORK & P. R. S. S. CO. v. JAMISON.

(District Court, S. D. New York.   March 23, 1917.)

**1. SHIPPING** ⟐⟐132(5)—DAMAGE TO CARGO—LIABILITY OF VESSEL.

Evidence *held* insufficient to show that damage to a cargo of sugar from seawater was caused by leaving a pump valve open, so as to relieve the ship from liability, under Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (Comp. St. 1916, § 8031), under the rule that, when such damage is shown, the burden rests upon the ship, in order to bring it within the statutory exemption, to show that it did not result from unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 483, 484.]

**2. SHIPPING** ⟐⟐142—DAMAGE TO CARGO—NOTICE OF CLAIM.

A provision of bills of lading requiring notice of any claim for damage to cargo to be given before the goods are removed from the dock is complied with, where notice is given after the cargo has been unloaded into lighters, which still remain at the ship's side.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496.]

⟐⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. Shipping ☞142—Damage to Cargo—Claim for Damages.

A provision of a bill of lading that claims for damage to cargo, with full particulars, must be given within 5 days after the goods are landed, must be given a reasonable construction, and where part of a cargo of sugar was damaged by seawater, and notice was promptly given and accepted, the fact that the claim was not formally presented within the 5 days will not defeat recovery, where it was impossible to ascertain the extent of the damage within that time, and the claim was made as soon as that could reasonably be done under the circumstances.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496.]

In Admiralty. Suit by William A. Jamison against the New York & Porto Rico Steamship Company, with cross-libel. Decree for libelant.

This is a libel for damage to part of a cargo of sugar ex steamship Berwind from San Juan to New York. The ship arrived in New York on June 23d and the sugar began to be discharged at 7:30 on the morning of the 24th. It was discovered thereupon that the lowest tiers of sugar in hatch No. 3 had been injured by seawater. On the 24th and 25th it was discharged upon lighters by McAllister & Co., and on the 27th Labonte, the libelant's agent, called up Maloney, the respondent's agent, and told him that the damage had occurred. Maloney said: "All right; I know it; send in your claim." The lighter No. 43, on which the sugar was laden, did not begin to discharge at the refinery until August 18th. Thereafter all the sugar was put through the usual course in the refinery, and under a polarization test 441 bags of it showed the damage by seawater. The libelants did not put in their claim, with particulars, until the 19th of September, for the following reasons: To test the sugar, a sample must be taken from each one of the 441 bags, which could have been done much earlier; but, although this would give the test as to that sugar, it would be impossible to find what the damage had been until the whole cargo had been subject to the same test, because the record of the uninjured sugar must be compared with the record of the injured sugar, to show the average difference in polarization, which is the measure of the loss in value. The reason why the bulk of the sugar was kept so long on the lighters was that the berths open to the libelants were occupied by ships, and it would have been much more expensive to land the sugar from the lighter than to keep it where it was, and it would also have been much more expensive to pay demurrage on waiting ships, if the sugar had been taken out of the lighters at the refinery.

The after part of the Berwind was all in one hold, entered by two hatches, 3 and 4. The ship's theory of the damage is that the port side of the after hold had been filled up to 56 inches in depth with salt water, and that this had got in because the assistant engineer, Hall, who could not be found at the time of the trial, had left open a valve which led into the bilges from the plunger pump. This plunger pump is connected with the ship's engines, and is always working while the engine is working. A pipe leads from the condenser to the pump, and another pipe from the pump to the bilges, through the manifold. The deposition of the Berwind's engineer is much too vague, even when coupled with his chart, to show exactly what was the action of the plunger pump upon the bilges, but greater specification is quite unnecessary for a decision of the case. Enough appears to show that the salt water inlet from the condenser was below the water line when the ship was loaded, and that, if the pump stopped, as it did when the engine stopped, a direct connection between the sea and the bilge was established, unless the valves were closed. The only witness for the respondent was the engineer, who said that he came down on the 25th, found water in the hold, and saw the damaged sugar. He found only enough water just to cover the ceiling board, but there was a mark on the bulkhead showing that there had been 56 inches in that part of the hold. When he examined the ship, all the valves were, however, turned off, and on asking Hall, the engineer, he said

he had turned them off when the engine stopped, which was on the 23d. The ship's theory is that, as there is no other way in which the water could have entered, it must have been as mentioned. The engineer swears that after the hold had been pumped dry no further water came in, showing that the seams, the bilges, and the tank tops were tight.

The steamer's log shows that she docked at 8 a. m. on June 23d, and on the morning of June 24th began to discharge sugar. The next entry, on page 17 of the log, at present seems to read, "Wednesday, June 24," but it was originally written, "Thursday, June 25," and is the log for that day. The soundings for the 24th in the after hatch on the starboard side show that there were only 3 inches, and on the port side no water, and that on the 25th in the after hatch on the starboard side there were 6 inches of water, and on the port side 5 inches.

T. Catesby Jones, of New York City, for libelant.
Ray R. Allen, of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). [1] The first and most important point is whether or not the ship is relieved under the Harter Act. The case falls either under The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794, or The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748, and depends upon whether the ship has discharged the burden of proof that the damage did not arise because of her unseaworthiness. The facts in The Wildcroft, supra, were very like those in the case at bar, and the vessel was exonerated. She came into her dock at Philadelphia, and her cargo, which happened to be of sugar, as in this case, was damaged by fresh water, but in that case it was shown that the seacock for filling the engine room tank was open at 10 o'clock in the morning and was kept open for 3 hours, and that directly after the closing of the seacock water to a considerable depth was reported in holds 3 and 4.

There are several reasons in the case at bar for refusing to accept the explanation offered by the ship. In the first place, no one found any of the necessary valves open. When Weston looked at them, they had been closed, and when he questioned Hall, Hall said that he had not left them open. In the second place, we have the soundings on the 24th and 25th. The log shows that the ship made fast alongside of Pier 35 of the Atlantic Basin at 8 a. m. on the 23d, and presumably the engines were stopped at once. On the morning of the 24th the port side of the after hatch showed no water whatever, and at 7 o'clock on the morning of the 25th only 5 inches had gathered. It is quite true that the entry for the 25th shows changes; but on scrutiny it is quite apparent that the second entry, marked, "Wednesday, the 24th," was a mistake, and was intended to cover the 25th. The contents of the two entries shows that they were consecutive, and that the ship began discharging her sugar on the morning of the 24th and finished on the afternoon of the next day. It is not necessary to go over all the entries of that day, but an inspection will certainly show that I am right. If the ship's story is true, the bilges began filling through the pipe on the morning of the 23d and if 56 inches of water at any time had gathered in the port bilge of the after hatch, it would have shown by the soundings on the 24th, and by 7 a. m. on the 25th.

It is true that there is force in the explanation offered, as the single adequate suggestion, but since it breaks down it will not serve. The shipper need not show how the damage occurred; that is the ship's duty, and mere damage by seawater will not alone serve to exonerate the ship, even if it remains totally unexplained. The Folmina, supra. I conclude, therefore, that the ship has failed to show adequately any cause for the entrance of the seawater, which is equivalent to saying that she has not shown seaworthiness.

[2] The remaining questions arise under the exception of the seventh article of the bill of lading, which provides, first, that notice of any claim must be given before the goods are removed from the ship's dock, and that the claim with full particulars must be given within 5 days. Immediate notice of the claim was certainly given by Labonte to Maloney, who was present in court, and who did not deny the conversation. At that time the sugar lay alongside the ship in lighters; at least it was not shown to have been removed from the ship's side, which for this purpose is the equivalent of the dock. Maloney, who was in charge, certainly accepted the notice when it was given, and if the lighters were not alongside he waived the irregularity by telling the libelant to send in its claim.

[3] The more difficult question is the excuse for failure to give the claim with particulars within 5 days. Such provisions are legal. The Queen of the Pacific, 180 U. S. 49, 21 Sup. Ct. 278, 45 L. Ed. 419; The Persiana, 185 Fed. 396, 107 C. C. A. 416; The Westminster, 127 Fed. 680, 62 C. C. A. 406. However, it has always been recognized that they should receive a reasonable interpretation. It was impossible to have landed the whole cargo at some other pier, to have carried it to the refinery, and to have put it all through the polarization test within 5 days, and therefore the clause could not be literally fulfilled. Under such circumstances it must be given as reasonable and as near an application as the facts warrant. The libelant was, of course, bound to minimize its damages, and if it had landed the whole cargo, as it would have had to do, to obtain the particulars, it must have disregarded that duty. Certainly, when literal compliance was impossible, the true test must be such speed as was consistent with its other duty to the ship. The evidence shows that it acted as speedily as it could, having due regard to economy in the handling of the cargo at that time and place. That was the only compliance possible, unless the clause is to be taken to constrain the shipper to an impossibility.

The libelant may take its decree, and the cross-libel will be dismissed.